LENNON, MURPHY & LENNON LLC
Attorneys for Plaintiff
PEGASUS DENIZCILIK A.S.
Kevin J. Lennon
Charles E. Murphy
The GrayBar Building
420 Lexington Avenue, Suite 300
New York, NY 10170
(212) 490-6050 - phone
(212) 490-6070 - facsimile

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

07 CIV 8646

--------------------------------------------------------X

PEGASUS DENIZCILIK A.S.,                    :        07 Civ. _____ (    )

                                            :

                        Plaintiff,          :        **ECF CASE**

                                            :

            - against -                      :

                                            :

FILOMEY BUSINESS LTD.,                       :

                                            :

                        Defendant.           :

--------------------------------------------------------X

## VERIFIED COMPLAINT

Plaintiff, PEGASUS DENIZCILIK A.S. (hereinafter referred to as "PEGASUS" or

"Plaintiff"), by and through its attorneys, Lennon, Murphy & Lennon LLC, as and for its

Verified Complaint against the Defendant, FILOMEY BUSINESS LTD. (hereinafter referred to

as "FILOMEY" or Defendant) alleges, upon information and belief, as follows:

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333. Jurisdiction over this

matter is also present pursuant to the Federal Arbitration Act, 9 United States Code § 1 et seq.,

and this Court's federal question jurisdiction, 28 United States Code § 1331.

2.      At all times material to this action, Plaintiff was, and still is, a foreign company

duly organized and operating under the laws of Turkey.

3. Upon information and belief, Defendant FILOMEY was, and still is, a foreign corporation or other business entity organized under and existing by virtue of foreign law, with a place of business in Tortola, British Virgin Islands.

4. By a charter party dated October 8, 2004 PEGASUS, as disponent owner, chartered the commercial motor vessel KRISSA (hereinafter referred to as the "vessel") to FILOMEY for the carriage of about 6,775 tons of steel cargo from Eregli, Turkey to Camden, New Jersey.

5. During the course of the charter party FILOMEY failed to remit payment to PEGAUS for load port demurrage[1]. Despite repeated demands for payment of the outstanding demurrage, FILOMEY failed to ever satisfy this debt to PEGASUS.

6. As a result of FILOMEY'S aforesaid breach of the charter party, PEGASUS has sustained damages in the total principal amount of $46,177.08, exclusive of arbitration costs and attorneys fees.

7. The aforesaid charter party provides that disputes will be settled in London arbitration with English law to apply. London arbitration has now been completed and the arbitrators have issued their *First Final Arbitration Award* finding in favor of PEGASUS and denying FILOMEY's counterclaim. See attached hereto as Exhibit "1" a true and accurate copy of the *First Final Arbitration Award.*

8. PEGASUS as the prevailing party was awarded the following amounts in the London arbitration:

    a. Demurrage in the sum of $45,022.65;

---

[1] Demurrage is a liquidated damage for delay set forth in the charter party that requires a vessel charterer to pay the vessel owner when the vessel is prevented from the loading or discharging of cargo within the stipulated laytime (i.e., the maximum time permitted in the charter party for cargo operations).

2

b.      6.75% interest, compounded quarterly, on the sum of $45,022.65 from
February 1, 2005 until the date of payment by FILOMEY. The current interest due from
FILOMEY on the principal sum due for demurrage is $8.814.40. The total interest due until the
date of payment, estimated at February 1, 2008, is $10,012.72;

c.      PEGASUS' legal fees incurred in London arbitration which as best as may
be presented estimated are £5,204 or $10,613.06;

d.      7.25% interest, compounded quarterly, on the sum of $10,613.06 from
February 9, 2007 until the date of payment by FILOMEY. The current interest due from
FILOMEY on the principal sum due for PEGASUS' legal costs is $506.81. The total interest
due until the date of payment, estimated at February 9, 2008, is $790.66;

e.      PEGASUS' arbitration fees incurred in London arbitration which were
£4,025 or $8,209.03; and

f.      7.25% interest, compounded quarterly, on the sum of $8,209.03 from
February 27, 2007, that date that PEGASUS paid said fees, until the date of reimbursement of
said fees by FILOMEY. The current interest due from FILOMEY on the principal sum due for
PEGASUS' arbitration costs is $363.25. The total interest due until the date of payment,
estimated at February 9, 2008, is 611.53.

9.      PEGASUS seeks recovery of items (a) – (f) described in Paragraph 8 in the sum
total of $75,259.65.

10.     PEGASUS also seeks recovery of its legal fees and costs incurred herein for
obtaining security for its claim pursuant to Supplemental Rule B and the costs of recognizing and
enforcing its London arbitration award against FILOMEY in New York. As best as may be
presently estimated it is expected that its legal fees and costs will be $7,500.

3

11. Upon information and belief and following a good faith investigation, Plaintiff avers that the Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendant.

12. The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any assets of the Defendant held by any garnishee(s) within the District for the purpose of obtaining personal jurisdiction over the Defendant, and to secure the Plaintiff's claim as described above.

13. The Plaintiff also seeks an Order from this Court recognizing, confirming and enforcing PEGASUS' London arbitration award pursuant to 9 U.S.C. §§ 201 *et seq.*

**WHEREFORE**, Plaintiff prays:

A. That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Complaint, failing which default judgment be entered against it in the sum of **$82,759.65**;

B. That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also

4

pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of **$82,759.65** belonging to, due or being transferred to, from, or for the benefit of the Defendant, including, but not limited to, such property as may be held, received or transferred in Defendant's name, or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

C.      That pursuant to 9 U.S.C. §§ 201 *et seq.* this Court recognize and confirm PEGASUS' London arbitration award rendered on the claims had herein as a judgment of this Court;

D.      That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

E.      That this Court award Plaintiff the attorneys' fees and costs incurred in this action which, as best as may be presently estimated, will be $7,500; and

F,      That the Plaintiff has such other, further and different relief as the Court may deem just and proper.

Dated: New York, NY
       October 5, 2007

The Plaintiff,
PEGASUS DENIZCILIK A.S.

By: _____

Kevin J. Lennon
Charles E. Murphy

LENNON, MURPHY & LENNON, LLC
The Gray Bar Building
420 Lexington Ave., Suite 300
New York, NY 10170
Phone (212) 490-6050
Fax (212) 490-6070
kjl@lenmur.com
cem@lenmur.com

6

## ATTORNEY'S VERIFICATION

State of New York    )
                     )    ss.:    City of New York
County of New York   )

1.    My name is Charles E. Murphy.

2.    I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

3.    I am a partner in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the

Plaintiff.

4.    I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information
and belief.

5.    The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now
within this District.

6.    The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents
and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated:    New York, NY
          October 5, 2007

_____
Charles E. Murphy

7

EXHIBIT "1"

## IN THE MATTER OF THE ARBITRATION ACT 1996

**AND**

## IN THE MATTER OF AN ARBITRATION

BETWEEN

Pegasus Denizcilik A.S.

Claimants
(Disponent owners)

and

Filomey Business Ltd

Respondents
(Charterers)

**"KRISSA"**

Charterparty dated 8th October 2004

**FIRST FINAL ARBITRATION AWARD**

2

## IN THE MATTER OF THE ARBITRATION ACT 1996

**AND**

## IN THE MATTER OF AN ARBITRATION

BETWEEN

Pegasus Denizcilik A.S.                     Claimants
                                            (Disponent owners)

and

Filomey Business Ltd                        Respondents
                                            (Charterers)

### "KRISSA"

Charterparty dated 8th October 2004

### FIRST FINAL ARBITRATION AWARD

**WHEREAS:**

1. By a Charterparty on the GENCON form, incorporating additional terms as agreed
   between the parties on 8th October 2004 ("the Charterparty"), the Claimants who are
   the disponent owners ("the Owners") chartered their m.v. "KRISSA" to the
   Respondents ("the Charterers") to load and carry about 6,775 tonnes of steel products
   from Eregli and Iskenderun to Camden.

3

2. Clause 53 of the Charterparty provided for English law to govern the contract and for any disputes arising there under to be referred to arbitration in London. The parties subsequently agreed that the London Maritime Arbitrators Association Terms 2002 should apply to the reference.

3. Following a dispute between the parties, the Owners appointed the undersigned Alan Oakley of Hoy's Farm, Upwick, Ware, Hertfordshire as their nominated arbitrator and the Charterers appointed the undersigned Clive Aston of 30 Hobbs Court, 2 Jacob Street, London  SE1 2BG as their nominated arbitrator. We are full members of the London Maritime Arbitrators Association ("the LMAA"). We are also members of the Baltic Exchange in the City of London. The seat of this arbitration is in England.

4. Both parties were represented by firms of London solicitors. The Owners instructed Winter Scott and the Charterers instructed Derrick French & Co.

5. On 1st December 2005, the Owners served claim submissions and claimed the sum of US$46,177.08 in respect of outstanding load port demurrage, together with interest and costs. On 3rd February 2006, the Charterers denied liability for the Owners' claim and made a counterclaim of US$96,731.50 in respect of additional discharging costs incurred at Camden due to gear break downs, together with interest and costs. The Owners served reply submissions. However, although the Charterers were invited to serve further submissions they declined to do so.

6. Neither party requested an oral hearing.

7. The reasons for our award are set out in the document attached hereto which forms part of this First Final Arbitration Award.

4

NOW WE, the said Alan Oakley and Clive Aston, having taken upon ourselves the
burden of this reference and having carefully and conscientiously considered the
submissions and correspondence put before ns and having given due weight thereto and
having discussed the matter between ourselves and found ourselves in agreement, DO
HEREBY MAKE, ISSUE AND PUBLISH this our joint and agreed FIRST FINAL
ARBITRATION AWARD as follows:

WE FIND AND HOLD that:

1)    the Owners' claim for demurrage succeeds in the sum of US$45,022.65 and no
       more; and

2)    the Charterers' counterclaim fails and is hereby dismissed.

WE THEREFORE AWARD AND DIRECT that:

3)    the Charterers shall forthwith pay to the Owners the sum of US$45,022.65 (forty-
       five thousand and twenty-two United States dollars and sixty-five cents) together
       with interest thereon payable at the rate of 6.75% per annum compounded at three
       monthly rests from 1st February 2005 until the date of payment;

4)    the Charterers shall bear and pay their own and the Owners' recoverable costs of
       this reference on the standard basis which, unless agreed, shall be determined by
       us hereafter in an Award on Costs, pursuant to Section 63(3) of the Arbitration
       Act 1996, on the basis set out in Section 63(5) of the Act for which purpose we
       hereby reserve our jurisdiction;

5)    the Charterers shall also bear the costs of this Award in the sum of £4,025
       provided that if, in the first instance, the Owners shall have paid any amount in

5

respect of such costs, they shall be entitled to an immediate refund of that amount from the Charterers; and

6)  the Charterers shall also pay interest on the Owners' costs awarded in paragraph 4 above and on any sum paid by the Owners in respect of the costs of this Award set out in paragraph 5 above at the rate of 7.25% per cent per annum compounded at three-monthly rests from the date hereof until payment in respect of the Owners' costs and from the date of any payment to us by the Owners in respect of the costs hereof until reimbursement of such sum by the Charterers.

THIS ARBITRATION AWARD is interim in the reference, however final as to matters decided herein. We reserve our jurisdiction to make further Award(s) in respect of matters not dealt with herein.

Given under our hands this    9th    day of February 2007.


Alan Oakley                          Witness


Clive Aston                          Witness

6

## "KRISSA"

Charterparty dated 8th October 2004

### REASONS FOR OUR FIRST FINAL ARBITRATION AWARD

1   The m.v. "KRISSA" ("the vessel") is a 21,000 tonne deadweight bulk carrier built in
    1979. By a Charterparty agreed on 8th October 2004 ("the Charterparty"), the Owners
    chartered the vessel to the Charterers to load and carry about 6,775 tonnes of steel
    products from Eregli and Iskenderun to Camden. The Charterparty was performed
    and the vessel loaded about 6,673 tonnes of cargo.

2   In this dispute, the Owners claimed the sum of US$46,177.08, in respect of
    outstanding load port demurrage. The Charterers denied liability and made a
    counterclaim in the sum of US$96,731.50 in respect of additional discharging costs
    incurred due to gear break downs at the discharge port, together with interest and
    costs.

3   The issues that arise in this dispute are as follows:
    i)    the correct calculation of laytime and, if applicable, demurrage at Iskenderun;
          and
    ii)   whether the Owners are liable for further costs at the discharging port.

4   It is helpful to explain that no formal charterparty document was drawn up and that the
    fixture was evidenced by an e-mail dated 8th October 2004 ("the fixture recap"), which
    otherwise referred to the terms of an executed pro-forma charterparty (see exhibits 1
    and 2 of the claim submissions). Therefore, the terms set out in the fixture recap
    override those set out in the pro-forma charterparty, namely that of the "TORM
    ARAWA" charterparty dated 9th September 2004 ("the pro-forma charterparty") which
    terms, in turn, override those of the Gencon 1976 form charterparty. Under English
    law it is sufficient for the terms of a charterparty to be agreed orally and the contract

7

does not require to be evidenced in writing and signed by the parties.

5    In this reference, claim, defence (and counterclaim) and reply (and defence to
counterclaim) submissions were served. However, despite being given every
opportunity to serve further submissions, the Charterers declined to do so. Therefore,
in circumstances where the Charterers only served one set of submissions and failed to
respond to the Owners' reply, it is difficult to know what submissions, if any, the
Charterers continued to dispute. We have therefore tried to address each issue raised
by the Charterers' in their submission.

(I) Laytime and demurrage at Iskenderun:

6    The Owners claimed demurrage at Iskenderun in the amount of US$46,177.08. The
Charterers denied that the Owners entitled to demurrage. The difference between the
parties was the time when laytime commenced counting on 19th or 20th November
2004.

7    The Charterers contended that this was a "berth charter" as regards loading at
Iskenderun, where the berth was specifically named as the Yazici berth. Therefore, the
NOR given at 12:00 on Friday 19th November was invalid and was not effective until
13:00 that day when the vessel arrived at the berth. Accordingly, laytime did not
commence until 08:00 on Saturday 20th November. Furthermore, since the
Charterparty did not provide for time to count before the commencement of laytime,
time used between 17:40 on 19th November and 08:00 on 20th November, did not
count as laytime.

8    Since time only started counting at 08:00 on Saturday 20th November, the Charterers
only used 24 hours laytime to load the vessel, which meant that the Owners were not
entitled to demurrage under the terms of the Charterparty, which allowed one day for
loading.

8

9   The Charterers contended that if it was found that the Owners were entitled to demurrage at Iskenderun, the terms of the Charterparty only provided for a demurrage rate of US$6,500 per day pro rated.

10   The Owners' evidence was that Iskenderun is the collective name of the commercial ports within the bay, one of which is Yazici Pier, which consists of six separate berths. Therefore, the Charterparty did not designate a specific berth at Iskenderun and the area of Yazici port did not fall within the scope of a berth charter. Therefore, the master was entitled to tender the NOR once the vessel was within the commercial limits of the port and the notice given at 12:00 on 19th November was valid.

11   The Owners argued that given the "*WWWW*" provision of the fixture recap (which we accept includes the provision of "whether in berth or not"), the master was entitled to tender the NOR once the vessel entered the commercial area of the port. Furthermore, the NOR given at 12:00 on 19th November was accepted without qualification. Therefore, the Charterers were estopped from denying that it was a valid NOR. Moreover, since the fixture recap provided for the NOR to be tendered anytime between 08:00 and 17:00 on weekdays and that time counted from 08:00 or 14:00, the fact that the vessel berthed and the Charterers accepted that the NOR was effective from 13:00 on 19th November, meant that time started counting from 14:00 hours that day in any event.

12   As to the question of the correct rate of demurrage payable at Iskenderun, the Owners contended that the fixture recap was clear and that the rate was US$13,000 per day, pro rated.

13   As to our findings in the matter, the fixture recap referred to the load ports as "*1SP BSEA EREGLI PLUS 1SP ISKENDERUN, YAZICI BERTH*". However, despite the Owners' evidence that Yazicilar pier consisted of 6 berths, we consider that the reference to "*YAZICI BERTH*" is sufficient to make this a berth charter as far as Iskenderun is concerned: see Schofield "laytime and demurrage" 4th edition at paragraph 1.22 that a charter can be a berth charter as well as a port charter: also see paragraph 3.30 that a named wharf or jetty may have 2 or 3 berths on it – in this case,

9

the port information referred to the berth being 700 meters in length, able to accommodate up to 6 vessels simultaneously (depending on dimensions) – the Vessel had an LOA of 179 meters which mean that the berth could accommodate 3 or 4 vessels of a similar size.

14   Therefore, although the fixture recap included the reference to *"WWWW all ends provided w/l arrived w/l commercial limits of the port"* which includes the provision *"whether in berth or not"*, the NOR could only be tendered from the commercial limits of the port provided the berth was unavailable at the time: see Schofield paragraph 3.374.

15   There was no evidence that the berth was unavailable, Therefore, the master was only entitled to tender the NOR once the vessel arrived at YAZICI BERTH. It therefore follows that the NOR given at 12:00 on Friday 19th November was invalid. However, the Charterers accepted that it was unnecessary for the master to re-tender the NOR once the vessel arrived at the berth and therefore the NOR was effective from 13:00 on 19th November.  The question therefore arises whether laytime started to count at 14:00 on 19th November as the Owners contended, or at 08:00 the following day, as the Charterers contended.

16   The Charterers referred to paragraph 22 of the pro-forma charterparty which provided as follows:

   *"At load port, Notice of Readiness to be tendered in writing by cable during ordinary office hours Monday/Friday 0900/1700 hours and 0900 hours through noon on Saturday and time to count from 08:00 on the next working day".*

However, the fixture recap provided that *"AT LOAD PORTS NOR TO BE TENDERED MON 08 AM – SUN 5PM …"* and that *"TIME TO COUNT 8 AM 2 PM ALL ENDS."* As we have made clear above, the terms of the fixture recap prevail over those of the pro-forma charterparty. Therefore, since it is clear – and the Charterers accept – that the NOR was effective at 13:00 hours, on our reading of the fixture recap time started counting from 14:00 hours on 19th November, rather than 08:00 the

10

following day. Therefore, the Charterers' reliance on clause 22 of the pro forma is
misplaced since it is overridden by the express provision of the fixture recap.

17   As to the applicable demurrage rate at Iskenderun, the fixture recap provides that
"*DEMURRAGE USD 13,000 PD PR FD AT EREGLI AND CAMDEN, HD AT
ISKENDERUN.*" The respective load rates were 1,000 tonnes SHINC at Eregli and 1
day SHINC at Iskenderun, which required separate laytime calculations for each port
in order to calculate whether demurrage or despatch had been earned. Therefore, any
experienced commercial man reading the fixture recap would realise that the
demurrage rate of US$13,000 per day applied to all load and discharge ports, whilst
the following abbreviated wording referred to despatch and should be read as " ... free
despatch at Eregli and Camden, half despatch at Iskenderun".

18   In conclusion, we find that the Owners' laytime and demurrage calculation at exhibit 5
of the claim submission is correct and that they are entitled to demurrage for a period
of 3 days 13 hours 15 minutes at Iskenderun. However, pursuant to the terms of box
20 of Part I and clause 14 of Part II of the Charterparty, 2.5% commission is payable
on demurrage. We have therefore awarded the Owners the net sum of US$45,022.65
(US$46,177.08 less 2.5%) in respect of demurrage earned at Iskenderun.

**(II) Discharging costs:**

19   The Charterers alleged that during the discharge operation at Camden, the Owners
were in breach of vessel's gear and maintenance warranties – which contained clear
and unlimited obligations to keep the vessel's gear in good working order so that it
could work continuously and without interruption. However, as a result of the
vessel's gear breaking down (or becoming inefficient), the Charterers had to hire
shore cranes and incurred additional stevedoring costs. They therefore sought to
recover damages of US$10,525 relating to overtime costs and the cost of hiring shore
gear, together with increased stevedore costs of US$96,731.50. The Owners had
previously paid the stevedores US$10,525 in respect of 50% of overtime costs and
the cost of hiring shore cranes. However, the Charterers sought recover of 100% of

11

these costs, together with the increased stevedoring costs.

20   The Owners accepted that between 20th and 23rd December 2004, the Vessel did
     encounter difficulties with her gear at Camden. However, their evidence was that
     this was due to freezing weather conditions. The problem was remedied on 22nd
     December, when anti-freeze liquid was added to the gear hydraulics. The only other
     inefficiency was between 12:35 and 13:15 on 29th December, when the transmitter
     on derrick no. 4 failed and had to be repaired.

21   The Owners relied on the provision in the fixture recap that the *"CHARTERERS TO
     HAVE FREE USE OF VESSEL CRANES WHICH TO BE KEPT IN GOOD
     WORKING ORDER. ALL VSL'S CRANES ARE ABLE TO WORK
     SIMULTANEOSLY AND SERVE ALL VSL'S HATCHES."* Therefore, their obligation
     with regard to the vessel's inefficiency was not unlimited or continuous as alleged by
     the Charterers. They also denied that they were liable for any discharging costs under
     an F.I.O. charterparty. In any event, the Charterers continued to employ shore cranes
     after the vessel's gear resumed full operation on 22nd December.

22   Although the Owners agreed to bear 50% of the overtime costs and the cost of hiring
     shore cranes, their evidence was that the Charterers agreed to share the costs equally.

23   As to our findings in this matter, the Charterers alleged that the Owners were in
     breach of the vessel's gear and maintenance warranties under the Charterparty at
     Camden. However, the Charterers' submissions caused us some difficulty for several
     reasons.

24   First, although the evidence was that the vessel's gear was deficient between 06:30
     on 20th December and 14:00 on 22nd December, the Charterers' statement of facts
     indicated that the gear operated normally thereafter: see entries for 24th, 27th, 28th and
     29th December – bad weather or holidays affected work on the missing days.
     However, the same evidence also shows that the Charterers (or the Receivers)
     continued to employ shore cranes on 24th, 27th and 28th December – often working
     simultaneously with the vessel's gear.

12

25    Secondly, although the Charterers failed to refer to specific Charterparty provisions,
it seemed to us that their remedy for deficient gear lay under clause 48 and/or 49,
which provided as follows:

Clause 48:
"*In the event of vessel crane's breakdown time to count pro-rata to the actual
number of gangs worked.*"

Clause 49:
"*In the event of vessel crane's breakdown Charterers have the option of employing
shore cranes at Owners' expense and time to count in accordance with clause 49
(sic), subject to Owners' approval which to be advised.*"

26    Given the evidence before us, we would have expected the Charterers to rely on
clause 49 and to have provided an invoice for the cost of hiring the shore crane for
the period when the vessel's gear was deficient. The Charterers appeared to suggest
that the vessel's gear was deficient through to 28th December (when a shore crane
was still being employed) and that they claimed the entire cost of hiring shore cranes
– though they did not include any evidence of the overall cost or the cost of overtime.
As it was, the statement of facts and the extract from the vessel's log book recorded
that the gear became deficient at about 06:40 on 20th December, but that shore cranes
were operating by 08:45 hours. Therefore, what little time might have been lost to the
discharging operation would have fallen within the scope of clause 48 – the same
applied to the period between 12:35 and 13:15 on 29th December. However, since the
Charterers did not make their claim on this basis, it must be assumed that they
accepted that no time was lost on 20th December or 29th December.

27    Despite the severe weather conditions at Camden, we take the view that the Owners
were in breach of the vessel's gear and maintenance warranties under the
Charterparty. They were clearly weather working days and the gear was capable of
working with the correct hydraulic fluid. Furthermore, it seems to us that the Owners
accepted this view when they agreed to pay 50% of stevedore overtime costs and the

13

cost of the crane hire in the amount of US$10,525. As to whether the Owners should
have paid 100% of these costs, the Charterers bear the burden under clause 49 of
showing the correct level of costs applicable for the time of the inefficiency – which
we say was between 06:30 on 20th December and 14:00 on 22nd December. However,
in view of the evidence as to costs, we have based our decision on the fact that the
Charterers (or perhaps the Receivers) chose to continue to use shore cranes until 28th
December and that the cost of US$21,050 (2 x $10,525) was the overall cost of
hiring the cranes and overtime. Therefore, since the Charterers/Receivers continued
to use shore cranes, the Charterers are liable for a proportion of the overall costs.
Since the evidence was that the vessel's gear was deficient between 20th and 22[rd]
December and that the Charterers thereafter used the shore cranes for three days, we
consider that the apportionment of 50:50 is fair to both parties given the evidence
available to us. Since the Owners have already paid 50% of these costs, they have no
further liability to the Charterers.

28  Finally, we turn to the Charterers' allegation that they incurred additional stevedoring
costs due to the Owners breach relating to the Vessel's gear. The Charterers claimed
the difference between the stevedore's initial estimate of US$102,096 and the final
cost of US$198,827.50 i.e. a difference of UD$96,731.50. However, the Charterers'
evidence (the e-mail sent on 9th February 2005) suggested that the stevedores charged
only US$171,477.50 for discharging the vessel, which appeared to include some
overtime costs (see the entry between 19th and 29th December for 21 hours overtime
amounting to US$9,450). It is unclear whether this was part of the overtime costs
claimed under the first part of the counterclaim.

29  The evidence relating to this part of the Charterers' counterclaim is extremely
limited. Although the Charterers claimed the sum of US$96,731.50, their evidence
was at best confusing and, at worse, deficient. For example, the Charterers' evidence
relied on a message that they had sent to the Owners and did not include any
evidence from the stevedores of their final costs or why those costs increased
substantially from the original estimate. Furthermore, the Charterers did not refer us
to any specific provisions of the Charterparty upon which they relied.

14

30  The additional stevedoring costs clearly did not fall within the scope of clauses 48 or 49 or generally for Owners' account under an FIO charterparty. Therefore, absent an express provision in the Charterparty ~ and we were not referred to such ~ we take the view that the Charterers cannot recover additional stevedoring charges, the Charterers' remedy being limited to that specified in clauses 48 and 49 of the Charterparty. However, regardless of this interpretation of the Charterparty, the Charterers' evidence was deficient in any event and they failed to prove that the stevedore costs had increased, as alleged or the true level of that increase. It therefore follows that this head of the Charterers' counterclaim also fails.

### (III) Quantum:

31  In conclusion, we found that the Owners' claim succeeds in the sum of US$45,022.65 and that the Charterers' counterclaim fails and is dismissed.

### (IV) Interest:

32  We have awarded interest on the sum of US$45,022.65 at a commercial rate from 1st February 2005, by which date all issues of demurrage should have been agreed and settled between the parties.

### (V) Costs:

33  In accordance with the normal rule that costs follow the event, the Charterers shall bear their own and the Owners' recoverable costs, together with our costs of the reference.

15

## IN THE MATTER OF THE ARBITRATION ACT 1996

### AND

## IN THE MATTER OF AN ARBITRATION

BETWEEN

Pegasus Denizcilik A.S.
Claimants
(Disponent owners)

and

Filomay Business Ltd
Respondents
(Charterers)

## "KRISSA"

Charterparty dated 8th October 2004

## FIRST FINAL ARBITRATION AWARD